***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Rowell. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rowell with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties were properly before the Full Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The employer-employee relationship existed between the defendant-employer and the plaintiff at all relevant times herein.
3. Cunningham Lindsey Claims, Inc. provided defendant-employer with workers' compensation coverage at all relevant times herein.
4. On the date of the alleged injury by accident, the defendant-employer NPC-National Pizza Corporation regularly employed three (3) or more employees and that the defendant was a duly qualified insured employer.
5. It is stipulated that all parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
6. The plaintiff's claim was for an injury by accident arising out of and in the course of his employment with the defendant NPC-National Pizza Corporation to his right arm, neck, wrist and shoulder that is alleged to have occurred on June 14, 2001, the compensability of which the defendant NPC-National Pizza Corporation has partially admitted. However, the defendants have accepted as compensable only his right elbow and have denied the compensability of his neck condition.
7. Plaintiff received $4,430.76 in short-term disability benefits pursuant to a plan that is fully funded by defendant-employer.
8. For the pay periods ending on June 26, 2001, through February 5, 2002, plaintiff received $17,250.44 in wages from NPC-National Pizza Corporation.
9. The parties stipulate into evidence as Stipulated Exhibit #1, the pre-Trial agreement, as modified and initialed by parties.
10. The parties stipulate into evidence as Stipulated Exhibit #2, medical records.
11. The parties stipulate into evidence as Stipulated Exhibit #3, I.C. Form 22.
12. The parties stipulate into evidence as Stipulated Exhibit #4, plaintiff's résumé.
13. The parties stipulate into evidence as Stipulated Exhibit #5, plaintiff's job description with defendant-employer.
14. The parties stipulate into evidence as Stipulated Exhibit #6, defendants' letter dated February 18, 2003, filed with the Industrial Commission on February 20, 2003, stipulating that the parties agreed to plaintiff's average weekly wage being $574.35. This letter was received subsequent to the hearing before the Deputy Commissioner and marked as Stipulated Exhibit #6, and made a part of the record.
 RULINGS ON EVIDENTIARY MATTERS
The objections contained in Depositions of Dr. Frank E. Pollock, Jr. and Dr. Harlan B. Daubert are ruled upon in accordance with the applicable rule of law and the Opinion and Award in this case.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 46 year-old male with a high school education, who also had completed one year of college. He was hired as a manager trainee and restaurant manager for defendant-employer in May 2001. His immediate supervisor at the time of injury was Harriet Pennington. Ms. Pennington considered plaintiff to be a reliable employee with whom she had no problem working. Prior to June 14, 2001, plaintiff never had any notable neck or shoulder problems in the past.
2. On June 14, 2001 plaintiff was unloading a supply truck that was carrying cases of frozen pizza dough. The cases of frozen dough weighed approximately 25 pounds per box. While lifting a box to the top shelf in the freezer, plaintiff felt something in his arm up through his neck snap or pop or hurt. "It was just pain that shot down from my neck into my arm, but the worst pain was in my elbow at that time." The parts of plaintiff's body that he experienced pain coming from on June 14, 2001, while lifting the 25-pound box of frozen pizza dough, included his neck, shoulder-arm, and elbow.
3. There were no unusual circumstances with respect to plaintiff's lifting of the box of pizza dough, and the plaintiff was doing his normal job in the normal manner.
4. Plaintiff properly reported to his supervisor, Ms. Pennington, on June 14, 2001, his lifting incident and that he had hurt himself. Plaintiff continued to work on June 14, 2001, even though he was in some pain, and finished his shift.
5. Following June 14, 2001, plaintiff continued to work his normal job with defendant-employer. During this period of time he continued to experience ongoing pain, especially in his arm-elbow area. Plaintiff did not immediately seek medical treatment, as he felt since he was a manager trainee that he was expected to work if at all possible.
6. On August 30, 2001, plaintiff presented to PrimeCare of Kernersville with complaints of right arm injury of the elbow radiating to neck. Plaintiff reported that the injury occurred June 2001 while unloading a truck. The doctor prescribed medication and a sling, and scheduled plaintiff for a follow up appointment. The doctor allowed plaintiff to return to work with restrictions of no use of his right arm and no lifting above shoulder height.
7. Plaintiff returned to PrimeCare on September 4, 2001, at which time he was referred to an orthopedic surgeon for evaluation of what was then believed to be right elbow tendinitis.
8. Plaintiff had his first appointment with Dr. Frank E. Pollock Jr. of Orthopaedic Specialists of the Carolinas on September 24, 2001, for evaluation of right upper extremity pain. Plaintiff described discomfort which began around his elbow and then radiated toward his neck, across his right shoulder and toward the ulnar aspect of his arm. Dr. Pollock examined plaintiff and ordered a cervical CT as well as EMGs and PNCVs of plaintiff's entire right upper extremity. Dr. Pollock also kept Plaintiff out of work pending those tests and a follow up appointment with Dr. Pollock. The cervical spine CT was performed September 27, 2001. The EMG/nerve conduction study was performed on October 3, 2001. Dr. Pollock's impression of plaintiff's right shoulder was an impingement of his rotator cuff with arthritis of his acromial clavicular joint caused by repetitive lifting or an acute trauma.
9. On October 10, 2001, Plaintiff returned for follow-up of his neck, and right upper extremity to Dr. Pollock and was noted to be in severe discomfort. Dr. Pollock referred plaintiff to Dr. Daubert concerning plaintiff's neck condition, and advised that he expected Dr. Daubert would recommend a fusion at C6-7 and foraminotomy to the right.
10. On November 6, 2001, plaintiff was examined by Dr. Harlan B. Daubert. Dr. Daubert noted that plaintiff had previously been evaluated by Dr. Pollock with complaints of severe neck pain as well as right arm pain. Dr. Daubert diagnosed plaintiff with neck and right arm pain secondary to cervical spondylotic radiculopathy. He then recommended conservative treatment to include over-the-door traction as well as an MRI scan of the neck.
11. The cervical MRI was performed on November 9, 2001. On November 19, 2001, Dr. Daubert reviewed the MRI and other diagnostic data with plaintiff. Dr. Daubert recommended that plaintiff undergo C6-7 anterior cervical disc fusion with iliac crest bone graft.
12. On November 26, 2001, Dr. Daubert performed an anterior cervical diskectomy and osteophytectomy effusion with left iliac crest bone graft on plaintiff. Plaintiff did not return to work from November 26, 2001 to the present. Plaintiff had follow-up appointments with Dr. Daubert after the surgery on December 10, 2001 and January 8, 2002. On January 8, 2002, Dr. Daubert allowed plaintiff to return to work with restrictions, but afterwards placed plaintiff back on out of work status as of January 25, 2002 due to increased pain in his neck and right upper extremity.
13. When Dr. Daubert examined plaintiff again on February 4, 2002, he commented that the fusion was healing, but he also stated his suspicion that plaintiff had some weakness in the right rotator cuff. Based on his suspicion, Dr. Daubert injected Marcaine and Aristospan in the shoulder and referred plaintiff for physical therapy in the shoulder rehabilitation program. Dr. Daubert continued to keep plaintiff out of work.
14. On March 5, 2002, Dr. Daubert again examined plaintiff. He noted that plaintiff had severe pain in his arm but that his neck pain was improving. Due to this ongoing pain, Dr. Daubert ordered a repeat MRI scan of plaintiff's neck and shoulder. The cervical MRI was performed on March 22, 2002.
15. The right shoulder MRI was performed on April 6, 2002. On May 7, 2002, Dr. Daubert recommended that plaintiff again consult with Dr. Pollock with regard to the shoulder. Plaintiff treated again with Dr. Daubert on July 5, 2002 and September 6, 2002. As of December 19, 2002, Dr. Daubert considered plaintiff to still be in active treatment with regards to his neck condition.
16. Plaintiff returned to Dr. Pollock on May 15, 2002. After examining plaintiff and reviewing the diagnostic data, Dr. Pollock diagnosed plaintiff with impingement syndrome of the right shoulder and osteoarthritis of the right acromial clavicular joint. Based on that diagnosis, Dr. Pollock recommended plaintiff undergo arthroscopic subacromial decompression and coracoacromial ligament release. This surgery was performed by Dr. Pollock on June 17, 2002.
17. Due to plaintiff continuing to experience ongoing pain in his elbow and wrist area, Dr. Pollock sent plaintiff for repeat EMGs and PNCV's on August 12, 2002. Those studies did show some difficulty with plaintiff's ulnar nerve. According to Dr. Pollock, plaintiff has not yet attained maximum medical improvement with regard to the injuries for which he and Dr. Daubert have treated plaintiff.
18. On October 22, 2002, Dr. Daubert wrote a letter advising that he had been treating plaintiff regarding neck, right arm, shoulder, elbow and hand pain. In this letter Dr. Daubert states that the onset of plaintiff's symptoms are related to his work job demands as a manager at Pizza Hut.
19. In Dr. Daubert's opinion plaintiff's neck condition that he had been treating him for was more likely than not caused by or was aggravated by plaintiff's June 14, 2001 work-related incident.
20. Plaintiff has shown by the greater weight of the evidence that he has sustained an injury by specific traumatic incident of the work assigned to him on June 14, 2001, resulting in the neck and right shoulder condition for which he was being treated for by Dr. Daubert.
21. On June 14, 2001, plaintiff sustained a specific traumatic incident of the work assigned resulting in a neck condition for which he has been treated for by Dr. Daubert, and continues to need medical treatment for, including surgery performed by Dr. Daubert on November 26, 2001.
22. As a direct and proximate result of the injuries sustained by plaintiff on June 14, 2001, and his resulting medical conditions, plaintiff was unable to work earning the same or greater wages he earned before his injury, or any wages, in his former employment or any other employment since November 26, 2001.
23. At the time of the hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement and remains in the healing period. Plaintiff has not been evaluated for any permanent impairment.
24. Plaintiff is entitled to have defendants provide all medical treatment necessitated by his June 14, 2001 compensable specific traumatic incident, including all treatment recommended by Dr. Daubert.
25. Pursuant to defendants' letter dated February 18, 2003, and filed with the Industrial Commission on February 20, 2003, the parties stipulated that plaintiff's average weekly wage on June 14, 2001 was $574.35, yielding a compensation rate of $382.90 per week.
26. Plaintiff received $4,430.76 in short-term disability benefits pursuant to a plan that was fully funded by defendant-employer.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On June 14, 2001, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment and as a direct result of a specific traumatic incident of the work assigned on March 30, 2000 resulting in a neck condition for which he has been treated for by Dr. Daubert. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of plaintiff's specific traumatic incident on June 14, 2001, and his resulting medical conditions to his neck and right shoulder, plaintiff was unable to work earning the same or greater wages he earned before his injury, or any wages, in his former employment or any other employment since November 26, 2001 and continuing.
3. Plaintiff has not yet reached maximum medical improvement and remains in the healing period. Plaintiff has not yet been evaluated for any permanent impairment.
4. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable specific traumatic incident as may be required to provide relief, effect a cure or lessen the period of disability including all treatment recommended by Dr. Daubert. N.C. Gen. Stat. §§ 97-2(19), 97-25.
5. Plaintiff has an average weekly wage of $574.35, which yields a maximum compensation rate of $382.90.
6. As a direct and proximate consequence of plaintiff's compensable specific traumatic incident, plaintiff is entitled to temporary total disability compensation at a rate of $382.90 from November 26, 2001 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
7. Defendants are entitled to a credit for the short-term disability benefits received by plaintiff from a program fully funded by defendant-employer. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to the credit owed defendants and to the attorney's fee approved herein, defendants shall pay temporary total disability compensation to plaintiff at a rate of $382.90 per week from November 26, 2001, and continuing until further order of the Commission. Compensation due which has accrued shall be paid in a lump sum subject to attorney's fees hereinafter provided.
2. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under Paragraph #1 of this award is approved for plaintiff's counsel and shall be paid by defendants as follows: twenty-five percent (25%) of the lump sum due plaintiff under Paragraph one of this award which has accrued to date shall be paid directly to plaintiff's counsel. Plaintiff's counsel shall receive every fourth check of all future compensation.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability. These medical expenses shall include continuing treatment of plaintiff as recommended by Dr. Daubert.
4. Defendants shall pay the costs.
This the ___ day of May, 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER